UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASMEROM GEBRESELASSIE,

Petitioner,

v.

SCOTT FRAUENHEIM,

Respondent.

Case No. 16-cv-06195-WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner Asmerom Gebreselassie seeks federal habeas relief from his state convictions for murder and other crimes on the grounds that he received ineffective assistance of counsel and the trial court made various errors. None of his claims has merit. His petition for habeas relief is DENIED.

## BACKGROUND

Gebreselassie shot to death Winta Mehari, his brother Abraham's wife; Regbe Bahrenegasi, Winta's mother; and Yonas Mehari, Winta's brother; while the Mehari family was gathered at Winta's house on Thanksgiving Day in 2006.[1] (Ans., State Appellate Opinion, Dkt. No. 26-24 at 352.)[2] He also shot Yehferom Mehari, Winta's brother, who was wounded but survived. (*Id.* at 356.) Angesom Mehari, another brother, was seriously injured when he jumped out a window to escape. (*Id.*) Gebreselassie believed that Winta and her family had murdered Abraham, who had died the preceding

---

[1] The Mehari and Gebreselassie families, both native to Ethiopia, were very close, "like one family," and lived in the same apartment complex in Oakland. (Ans., Dkt. No. 26-24 at 353-354.)

[2] *People v. Gebreselassie*, Nos. A133350 and A134246, 2015 WL 5146199 (Cal. Ct. App. Sept. 2, 2015), as modified by denial of reh'g (Sept. 25, 2015).

March. (*Id.* at 354.)

There was no evidence of foul play in Abraham's death but Gebreselassie always suspected the Mehari family of murder.[3] (*Id.*) He pressed the police to investigate further, but they declined. (*Id.*) The Meharis banned Gebreselassie from their house because of his continued accusations against them. (*Id.* at 355.) They also agreed they would call the police if he ever came to their house again. (*Id.*) Petitioner testified at trial that Winta "was the most evil wife and the most evil human being on this earth" and the Meharis were the "most evil family in the whole world." (Ans., Dkt. No. 26-17 at 3864, 3868).

At trial, the prosecutor contended that Gebreselassie murdered Winta and the others as revenge for Abraham's death and that his co-defendant (and brother) Tewodros Gebreselassie helped him first by signaling to him when the Meharis were gathered and second by letting him into their house.[4] (*Id.*, Dkt. No. 26-24 at 357.)

Angesom, Merhawi, and Yehferom Mehari, Winta's brothers, all testified that they saw Gebreselassie, without provocation, shoot at the family. (*Id.* at 357-359.) Yehferom testified that Gebreselassie, while wielding two guns, came in saying, "Everybody here killed Abraham, I'm going to kill you." (*Id.* at 359.) Evidence was presented that the gun was empty of bullets when the firing stopped. (*Id.*, Dkt. No. 26-15 at 2556.) Gebreselassie testified that he had practiced shooting at a range roughly six or seven times and that he made sure the gun was loaded before he went to the Meharis' house. (*Id.*, Dkt. No. 26-17 at 3549-552.)

Gebreselassie testified at trial that he acted in self-defense. (*Id.*) He came to the Mehari house at Winta's invitation, which he regarded as suspect, and was attacked by her brothers Yehferom and Merhawi soon after he entered. (*Id.*, Dkt. No. 26-24 at 361-62.) The Meharis fired at him first. (*Id.* at 362.) He shot to defend himself, he says.

---

[3] Also, Gebreselassie was worried that Merhawi Mehari, Winta's brother, a homosexual, was molesting Isaac Gebreselassie, Abraham and Winta's son.

[4] On appeal, the judgment as to Tewodros Gebreselassie was reversed and the matter was remanded to the trial court for further proceedings. (Ans., Dkt. No. 26-24 at 394.)

United States District Court
Northern District of California

This defense was severely undermined.  There was no evidence that the Meharis fired a single shot.  The second gun found at the scene, the one allegedly used by the Meharis, was registered to Gebreselassie's brother Mulugeta.  (*Id.* at 357.)  Police found it had six live rounds in the magazine, the maximum such a gun could hold, indicating that no shot had been fired.  (*Id.*, Dkt. No. 26-15 at 2556.)

In 2011, an Alameda County Superior Court jury found Gebreselassie guilty of murder, premeditated attempted murder, and false imprisonment by violence.  (*Id.* at 364.)  The jury found true various sentencing allegations.  He was sentenced to three terms of life in prison without the possibility of parole, a life term, an indeterminate term of 75 years to life, and a determinate term of 57 years.  (*Id.*, Dkt. No. 26-6 at 3136-3141.)

Gebreselassie's attempts to overturn his convictions in state court were unsuccessful.  This federal habeas petition followed.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

3

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### I. Assistance of Trial Counsel

Gebreselassie changed counsel five times during the course of his criminal proceedings. He also represented himself for a time until the trial court terminated his pro se status, owing to his disruptive behavior.

Gebreselassie claims defense counsel Darryl Stallworth rendered ineffective assistance by (i) failing to object to Sergeant Morris's testimony that he did not believe petitioner's version of events; (ii) failing to object to the admission of two entries in Winta's diary; (iii) failing to move for a mistrial; (iv) providing defense strategy and work product to the prosecutor; (v) being unprepared for trial; and (vi) failing to file another motion for a mistrial.

These claims were not raised on direct appeal but rather on state collateral review. The state supreme court rejected the claims as untimely.[5] (Ans., Dkt. No. 26-24 at 735.) The state appellate court summarily denied the claims. (*Id.* at 459.) The state superior

---

[5] Respondent contends that these claims are procedurally defaulted, the state court having denied them as untimely. Procedural default can be excused for ineffective assistance of *trial* counsel claims, if certain conditions are met. *Martinez v. Ryan*, 566 U.S. 1, 11-12 (2012). In determining whether the conditions are met, the Court must engage in some review of the merits. *Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (to excuse procedural default, the claim of ineffective assistance of counsel must be "substantial"). To simplify matters, I will address the claims on their merits, without considering whether the claims are procedurally defaulted.

court denied them as procedurally barred and on the merits. (*Id.* at 456.) Because the claims were denied on the merits, the deferential AEDPA standard applies. But, even if the claims were reviewed de novo, they would still fail.

In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). He must also show that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (citing *Strickland*, 466 U.S. at 693).

The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation marks and citations omitted). "The question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### i. Failure to Object to Morris's Testimony

At trial, Sergeant Morris, who interviewed petitioner after the killings, testified that he did not believe Gebreselassie's account of the events at the Mehari house. Gebreselassie claims counsel rendered ineffective assistance by failing to object. (Pet., Dkt. No. 1 at 11.)

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not de novo. "[W]here a state

United States District Court
Northern District of California

court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Gebreselassie has failed to show prejudice. The evidence of guilt was quite strong: Gebreselassie sought revenge for the purported murder of his brother Abraham; he came armed with a gun to the Mehari house, from which he had been barred owing to his hostility toward the family; and Angesom, Merhawi and Yehferom Mehari testified that they saw Gebreselassie, without provocation, fire shots at the family until the gun was empty. On such robust evidence, counsel's failure to object to Morris's testimony cannot be thought to constitute ineffective assistance.

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

### ii. Failure to Object to the Admission of Diary Entries

Gebreselassie claims defense counsel rendered ineffective assistance for failing to object to the admission of two entries from Winta's diary. (Pet., Dkt. No. 1 at 17.) In those entries, which were written after Abraham's death, Winta expresses her love for Abraham and her concern about his family's poor treatment of her. (Ans., Dkt. No. 26-17 at 3418-3419, 3422-3423.) Before trial, Gebreselassie's prior counsel, not Stallworth, objected to their admission. The trial court allowed their admission only if Gebreselassie testified that Winta murdered Abraham. He so testified and the entries were admitted. Stallworth objected to the admission of the second diary entry as hearsay. (*Id.* at 3421, 3423.)

Their admission was permissible, despite petitioner's hearsay objections, according to the state appellate court. "[Gebreselassie] all but concedes, however, that the first entry regarding Winta's feelings about Abraham were [*sic*] admissible to prove her state of mind, and we agree." (*Id.*, Dkt. No. 379.) The second was admissible on similar grounds. (*Id.* at 379-380.)

6

The claim regarding the second entry is meritless because Stallworth did in fact object. The claim regarding the first entry shows neither deficient performance nor prejudice. The state appellate court's approval of its admission forecloses any plausible finding that counsel's performance was deficient. It is both reasonable and not prejudicial for defense counsel to forgo a meritless objection. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). Furthermore, the evidence against Gebreselassie was strong, as detailed above.

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

### iii.    Failure to Move for a Mistrial

The trial court ordered Gebreselassie removed from the courtroom because of his disruptive behavior and his failure to follow the court's instructions. As this happened, petitioner accused the court of "acting like a DA." (Ans., Dkt. No. 26-14 at 209.) There was a disagreement later, outside the presence of the jury, whether he said "DA." The prosecutor heard "bitch" or "dick" while the clerk heard "DA." (*Id.* at 237.) The prosecutor then said that petitioner "might think DA and bitch are synonymous." (*Id.* at 240.) Gebreselassie firmly stated that he said "DA." (*Id.* at 253.) The trial court later stated that he had said "DA." (*Id.* at 258.)

Gebreselassie claims Stallworth should have moved for a mistrial based on the prosecutor's comments. (Pet., Dkt. No. 1 at 22.) He claims that Stallworth refused to do so because he had a close relationship with the prosecutor. (*Id.* at 24-25.)

A defendant's due process rights are violated when a prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation omitted). Under *Darden*, the first issue is whether the prosecutor's conduct was improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

Habeas relief is not warranted here. Counsel likely thought a mistrial motion based on prosecutorial misconduct would have been futile. It is not plausible that the prosecutor's comment deprived Gebreselassie of a fair trial. The statement was made outside the presence of the jury. And the weight of the evidence against him, as detailed above, weighs firmly against any finding of prejudice. Counsel likely thought any motion would be denied. It is both reasonable and not prejudicial for defense counsel to forgo a meritless objection. *See Juan H.*, 408 F.3d at 1273.

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

### iv. Providing Defense Strategy and Work Product to Prosecutor

Gebreselassie claims Stallworth rendered ineffective assistance by providing the defense's strategy and work product to the prosecutor. (Pet., Dkt. No. 1 at 26.) He bases this claim on the following. For a while, Gebreselassie represented himself at trial, with Stallworth acting as advisory counsel. After he had been removed from the courtroom for disruptive behavior, Stallworth asked the court whether he would represent petitioner temporarily or permanently. Such clarification was important "because I would have a different defense in a number of different areas." (Ans., Dkt. No. 26-14 at 236.) When asked to comment, the prosecutor said her only concern, "and I think Mr. Stallworth has dealt with the issue based on the research he has done, is that the distinctions in the defenses could cause a potential issue with regard to continuing the trial without a mistrial." (*Id.* at 237.)

Habeas relief is not warranted here. It is not plausible to infer, based on the prosecutor's comment, that Stallworth gave Gebreselassie's defense strategy and work product to the prosecutor. A more likely reading is that the prosecutor was echoing Stallworth's concerns. She knew the strategies would be different because she heard Stallworth announce in court that very fact. She also knew that a clash of defenses might lead to concerns about the fairness of the trial. Gebreselassie's claim lacks merit. Other

than his jaundiced interpretation of the prosecutor's comments, he provides no evidence for this claim.

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

### v. Lack of Preparedness

Gebreselassie claims that Stallworth rendered ineffective assistance because he was not prepared for trial and knew nothing about the case. (Pet., Dkt. No. 1 at 28.) With two exceptions, his allegations are conclusory and generalized complaints about a lack of preparedness.[6] Rather than posing general allegations, a federal habeas petition "is expected to state facts that point to a real possibility of constitutional error." *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (internal quotation marks and citation omitted). Conclusory allegations are not sufficient.

His specific allegations are that Stallworth did not ask co-defendant Tewodros Gebreselassie any questions and did not consult with petitioner before trial, thereby depriving petitioner of representation at a critical stage of trial.

The first claim is refuted by the record. Stallworth did ask Tewodros questions. (Ans., Dkt. No. 26-17 at 977-978.) Gebreselassie also fails to detail what questions should have been asked, what information would have been elicited by such questions, nor how such information would have affected the trial.

The second claim is conclusory. Gebreselassie does not state what information Stallworth would have obtained at such meetings, nor how such information would have been useful at trial.

Furthermore, the trial court made explicit findings about Stallworth's preparedness. During the trial, the court required the prosecution, on a daily and weekly basis, to provide

---

[6] For example, Gebreselassie says that Stallworth could answer only 1 of 15 questions about the case petitioner put to him. (Pet., Dkt. No. 1 at 28.) He does not state what these questions were or how Stallworth's alleged inability to answer them affected the trial.

counsel with a list of the next day's witnesses and a prediction for when the case-in-chief would conclude. The court noted Stallworth spent a considerable amount of time visiting his client in jail:

> the Court further takes judicial notice of all the weekend days Mr. Stallworth went to the jail, consulted with [Gebreselassie] through – and the Court knows this because the court appointed records the Court had to review and sign off on during the entirety of the trial were given to the Court. The Court reviewed those records and they indicated that Mr. Stallworth went to the jail on the weekends in addition to in court appearances. There is no specificity in the allegation made that [Gebreselassie] didn't have an adequate opportunity to consult with the attorneys.

(Ans., Dkt. No. 26-18 at 667.)

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

### vi.     Failure to File Another Mistrial Motion

Gebreselassie wanted counsel to file another motion for a mistrial, this one based on the trial court's alleged misconduct. He alleges that the trial judge's "body language" improperly influenced the jury and that the court's "ridiculing and badgering" of him constituted misconduct. Counsel declined to file such a motion, which Gebreselassie regards as ineffective assistance. (Pet., Dkt. No. 1 at 31.) At a hearing on a motion to change counsel, Gebreselassie moved on his own for a mistrial on the grounds of trial court misconduct. The motion was denied. (*Id.* at 34.)

Habeas relief is not warranted here. Stallworth likely did not file such a motion because he knew it to be futile. Because a later motion based on such grounds was denied, it is clear that Stallworth's declination made no difference. With this in mind, Stallworth's performance cannot be thought deficient or prejudicial.

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

## II.    Assistance of Appellate Counsel

Gebreselassie claims appellate counsel rendered ineffective assistance by failing to raise the following six claims:  (i) he was denied the right to be tried by jurors of his choice; (ii) the trial court abused its discretion; (iii) he was denied the right for compulsory process to obtain witnesses; (iv) the trial court refused to allow him to recall certain witnesses; (v) the prosecutor presented false testimony; and (vi) the trial court was biased.

Respondent contends that these claims should be dismissed as procedurally defaulted, the state supreme court having denied the claims as untimely.  I agree.

These claims were not raised on direct appeal, but rather by way of state habeas petitions.  The state supreme court's decision reads in full as follows:  "The petition for writ of habeas corpus is denied.  (*See In re Robbins* (1998) 18 Cal. 4th 770, 780 [courts will not entertain habeas corpus claims that are untimely].)"  (Ans., Dkt. No. 26-24 at 735.)

### A.    Procedural Default

#### 1.    Procedural Default Principles

Federal habeas relief is barred on grounds of procedural default if a state denied claims because a petitioner failed to comply with the state's requirements for presenting them. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  The state's grounds for denying the claim "must be independent of the federal question and adequate to support the judgment." *Id.* at 729.  A state procedural bar is "adequate" if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. U.S. Dist. Ct. (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994)).

The state carries the initial burden of adequately pleading "the existence of an independent and adequate state procedural ground as an affirmative defense." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  If the state meets this requirement, the burden then shifts to the petitioner "to place that defense in issue," which the petitioner may do "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the

rule." *Id.*

When the Ninth Circuit has determined that a rule is adequate, the petitioner then must cite cases "demonstrating subsequent inconsistent application" to meet his burden under *Bennett*. *King v. LaMarque*, 464 F.3d 963, 967 (9th Cir. 2006). If the petitioner meets this burden, "the ultimate burden" of proving the adequacy of the state bar rests with the state, which must demonstrate "that the state procedural rule has been regularly and consistently applied in habeas actions." *Bennett*, 322 F.3d at 586.

To overcome a claim of procedural default, petitioner must establish either (1) cause for the default, and prejudice, or (2) that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989). To show cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McClesky v. Zant*, 499 U.S. 467, 497 (1991). To show prejudice, a petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)). If the petitioner fails to show cause, the court need not consider whether petitioner suffered actual prejudice. *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

To show a "fundamental miscarriage of justice," a petitioner must show that the constitutional error of which he complains "has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Murray*, 477 U.S. at 496). "Actual innocence" is established when, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id.* at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* A petitioner can

make a showing of "actual innocence" by presenting the court with new evidence that raises a sufficient doubt as "to undermine confidence in the result of the trial." *Schlup*, 513 U.S. at 324.

### 2. Analysis

Respondent has carried the initial burden of adequately pleading the existence of an independent and adequate state procedural ground as an affirmative defense. As respondent points out, the state supreme court denied Gebreselassie's habeas application as untimely with a citation to *In re Robbins*. The United States Supreme Court has held that California's timeliness rule, as announced in *In re Robbins*, is an adequate and independent state ground for the denial of federal habeas corpus relief. *Walker v. Martin*, 562 U.S. 307, 310, 312, 316-21 (2011).

Gebreselassie has not met his burden "to place that defense in issue." *Bennett*, 322 F.3d at 586. He has not asserted any "specific factual allegations that demonstrate the inadequacy of the state procedure." *Id.* Accordingly, his claims of ineffective assistance of appellate counsel are procedurally defaulted.

To overcome this procedural default bar, Gebreselassie must establish either cause and prejudice, or that a failure to consider his claims will result in a fundamental miscarriage of justice. *Harris*, 489 U.S. at 262. He has not established cause. Rather than articulating reasons showing that some objective factor external to the defense impeded his ability to comply with state procedure, he declares that appellate counsel was ineffective for failing to raise these claims. Ineffective assistance of appellate counsel does not excuse the failure to show cause. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). Because he has not shown cause, the Court need not determine whether he suffered prejudice. *Isaac*, 456 U.S. at 134 n.43.

Nor has Gebreselassie shown that a failure to consider the merits of his claims will result in a miscarriage of justice. There was substantial evidence of guilt, as discussed above. Gebreselassie's own testimony establishes that he hated the Meharis and blamed them for Abraham's death; he went to their house while armed with a gun, a gun he made

13

sure to fully load before he arrived; and he fired shots at them. His self-defense contentions were heavily undercut at trial. In sum, there is no claim or showing that the constitutional error of which he complains "has probably resulted in the conviction of one who is actually innocent." *Bousley*, 523 U.S. at 623 (citing *Murray*, 477 U.S. at 496).

Respondent's motion to dismiss petitioner's claims of ineffective assistance of appellate counsel as procedurally defaulted is GRANTED. These claims are DISMISSED.

## III. Denial of Continuance

Gebreselassie claims that the trial court unjustly denied a continuance, thereby violating his right to due process. (Pet., Dkt. No. 1 at 84, 94.) He alleges that because of the denial, he did not have time to prepare for trial and was not timely provided with discovery materials. (*Id.*)

The relevant facts are as follows. The first day of trial was supposed to be November 29, 2010. (Ans., Dkt. No. 26-24 at 371.) On that day, the trial was continued (to January 3) because co-defendant's counsel had a conflict. (*Id.*) At that same hearing, Gebreselassie moved to change counsel. (*Id.*) When that motion was denied, he asked to represent himself. (*Id.*) The trial court granted the motion; appointed Stallworth as advisory counsel and directed him to provide petitioner with the cases files; and "fully cautioned" petitioner that the January 3 trial date would not be continued "whether you're ready to go or not." (*Id.* at 371-372.)

On December 16, Gebreselassie asked for a three-month continuance so that he could investigate "newly discovered evidence," that is, the recording of the 911 call from the night Abraham died. (*Id.* at 372.) Petitioner said that he was still ready to go to trial on January 3 or even "tomorrow." (*Id.*) Stallworth said that the defense would be ready by January 3 or 10, 2011. (*Id.*) The court continued the trial to January 10, but denied the 3-month continuance. (*Id.*) The defense had known of the recording for eight months and would have enough time to review it by January 10. (*Id.*)

On January 3, 2011, Gebreselassie asked for a continuance so that he would have time to study the 911 recording. (*Id.*, Dkt. No. 26-13 at 150.) This request was denied

because the recording was not new evidence. (*Id*. at 150-151.) Petitioner said he had not received discovery. (*Id*. at 156.) Stallworth said he and an investigator were preparing the defense materials for him. The court ordered Stallworth and the investigator to come to court the next day to discuss the matter. (*Id*. at 167-169.)

On January 4, the court ordered Gebreselassie and the investigator to review the 1500 pages of materials Stallworth had brought to the hearing to ensure that petitioner had what he needed. The prosecutor stated that she had brought 1500 pages of materials, much of which had been subpoenaed by the defense. (*Id*., Dkt. No. at 214-215.)

On January 5, Gebreselassie asked for a continuance so that he could hire an audio expert to review the 911 tape. He also asked to retain a new attorney. He said nothing about discovery. The trial court denied the motions. (*Id*. at 240.) Stallworth stated that Gebreselassie had about 1500 pages of materials. He also discussed how he and the investigator would get the remainder of the discovery to him. (*Id*. at 265-266.)

On January 6, Gebreselassie asked for a continuance to get another attorney. The court said that would be allowed if prior counsel, public defenders Lew and Plumhoff, were willing and were ready. (*Id*. at 292.)

Trial began in January 2011. The defense started presenting its case three months later, in April.

Gebreselassie alleges that on the first day of trial he was still without thousands of pages of discovery, as well as audio tapes, and some CDs of crime scene photographs. (Pet., Dkt. No. 1 at 84-85.) He admits that a prior attorney (public defender Marvin Lew) had provided him with some 1200 pages of materials and seven tapes. (*Id*.)

The continuance claim was denied on appeal. Gebreselassie had had adequate time to prepare a defense. (Ans., Dkt. No. 26-24 at 372-73.) The case had been pending for four years, during which he "actively participated in preparation for his defense"; he failed to show he could not complete his review of the tape within the time frame; he and Stallworth had assured the court the defense would be ready by January 10; and his "tortuous history of changing representation" indicated he was using his self-representation

rights as a way of delaying trial.  (*Id.*)

To establish a constitutional violation based on the denial of a continuance motion, a petitioner must show that the trial court abused its discretion, which will be found if, after carefully evaluating all relevant factors, the denial was arbitrary or unreasonable.  *See Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir. 1985).  The relevant factors are: (i) whether the continuance would have inconvenienced witnesses, the court, counsel, or the parties; (ii) whether other continuances had been granted; (iii) whether legitimate reasons existed for the delay; (iv) whether the delay was the defendant's fault; and (v) whether the denial prejudiced the defendant.  *See United States v. Mejia*, 69 F.3d 309, 314 (9th Cir. 1995).  The ultimate test remains whether the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)) (internal quotation marks omitted).

Habeas relief is not warranted here.  First, Gebreselassie's claims are conclusory. He does not state what materials would have made a difference at trial.  Such conclusory allegations fail to "state facts that point to a real possibility of constitutional error." *Felix*, 545 U.S. at 655.  Furthermore, he had until April to review the materials and prepare a defense.  He makes no specific, supported allegation that the failure to have the materials at an earlier time prevented him from challenging the prosecution's case-in-chief.

Second, the state court's denial of the claim was reasonable.  During the four years trial had been pending, Gebreselassie had been an active participant in his defense and his continued changing of counsel supported an inference that he was engaging in dilatory tactics.  This last point is important.  Gebreselassie had had attorneys willing and able to represent him, persons familiar with the case, and who were prepared to mount a defense. His insistence on dispensing with professional representation, not the court's denial of his continuances, caused problems.

Third, he has made no showing of prejudice.  He admitted that he went to the Mehari house armed with a loaded gun; harbored deep hatred toward them; and fired his

gun at the family members. Also, his self-defense allegation was thoroughly undermined at trial.

It is not clear why the 911 tape was of value to his defense. It appears Gebreselassie believed the tape somehow showed that Winta murdered Abraham. Even if the tape was such evidence, how would it support his defense to Winta's killing? If anything, it would support the prosecution's theory that Gebreselassie shot for revenge, rather than in self-defense.

The state appellate court's rejection of the continuance claim was reasonable and therefore is entitled to AEDPA deference. The claim is DENIED.

## IV. Prosecutorial Misconduct

Gebreselassie alleges that the prosecutor engaged in misconduct by presenting false evidence. This claim was raised only on collateral review.

Angesom Mehari testified that on the night Abraham died, he was at a hip hop club close to an immigration office on California Street in San Francisco. He claims Beal, a police investigator, testified falsely at the direction of the prosecutor in order to support Angesom's alibi. (Pet., Dkt. No. 1 at 89-90.)

Failure to set forth a factual basis for a claim that a prosecutor knowingly presented false evidence dooms such a claim. *Morales v. Woodford*, 388 F3d 1159, 1179 (9th Cir. 2004).

This claim is meritless. First, Gebreselassie has not shown any factual basis that the prosecutor knowingly presented false evidence. Second, how Beal's testimony harmed his defense is unclear. Whether Angesom was at a night club or elsewhere on the night Abraham died is immaterial. What is material is whether Gebreselassie was prejudiced. As there was strong evidence of guilt, the answer is no.

Under an independent review of the record, the Court concludes that the state court's rejection of this claim was not objectively unreasonable. Under de novo review, the claim fails. The claim is DENIED.

## V. Counsel of Choice

Gebreselassie claims that the trial court violated his Sixth Amendment right to counsel of choice when it denied his request to appoint Lefcourt as counsel. (Pet., Dkt. No. 1 at 92.) The trial court likely did so because petitioner changed (or tried to change) counsel so frequently, as the following facts demonstrate.

Gebreselassie was first represented by public defenders Ray Plumhoff and Marvin Lew. In August 2008, he unsuccessfully moved to change counsel. In September 2008, William Dubois, a private attorney, became counsel. In August 2009, Gebreselassie wrote a letter to the court in which he complained about the allegedly poor quality of Dubois's representation. Later that month, Dubois asked to be relieved as counsel, citing a breakdown of the attorney-client relationship. The court granted the motion and re-appointed Lew as counsel, over Gebreselassie's objections. Lew was relieved in October when petitioner retained William Cole as counsel. Cole's representation "was also short-lived." In December, Cole was relieved and the public defender was reappointed. (Ans., Dkt. No. 26-24 at 364-365.)

In May 2010, Gebreselassie again moved to change counsel, citing his belief that the public defenders were agents of the prosecutor. The motion was denied. (*Id.* at 365.)

In June, counsel declared a doubt as to petitioner's competency. "He has been unable to prepare to testify because of his preoccupation with matters which we believe are properly characterized as paranoid delusions." The court suspended proceedings so that petitioner could be psychologically evaluated. (*Id.* at 365-366.)

In July, the court relieved the public defenders and reappointed Dubois, with the understanding that he "had other commitments" and would need backup counsel. On August 4, petitioner stated that he would have Lefcourt, a private attorney, represent him. The court denied the motion to change counsel because it had heard that Lefcourt had not wanted to take the case, a fact Lefcourt confirmed a few days later. On August 18, Dubois declined the appointment. Gebreselassie's family then attempted to retain Lefcourt, who stated he would take the case only if he could obtain funds from the county. The court was

wary of appointing Lefcourt, who had made five special appearances but had not made a general one — he had "sort of been hovering on this case." (*Id.* at 366-368.)

The court then appointed Darryl Stallworth as counsel with the understanding that Lefcourt would step in if he could obtain county funding. In September, Gebreselassie tried to have Lefcourt appointed, but the court declined. (*Id.* at 368-369.) Stallworth remained as counsel. This is the denial of counsel petitioner bases his claim on.

This claim was rejected on appeal:

> The court's decision here to disallow a further change of counsel was a valid exercise of its discretion. The history described above shows the court carefully balanced [Gebreselassie's] request to bring Mr. Lefcourt in against his extensive history of dissatisfaction with, and termination of, a series of qualified attorneys; the resulting delays and disruption to the judicial process; and the prejudice to Tewodros [who had sought to sever his trial from petitioner's], the prosecution, and witnesses that would have resulted from allowing yet another substitution. Its ruling did not impinge on [Gebreselassie's] constitutional rights to counsel of his choice.

(*Id.* at 370.)

The Sixth Amendment right to counsel includes a qualified right of the criminal defendant to have the counsel of his choice if he can pay for it and counsel is willing to serve. *See Wheat v. United States*, 486 U.S. 153, 159, 164 (1988). "While the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* The right is qualified in that it "may be overcome by . . . 'a showing of a serious potential for conflict,'" or that the proposed choice will interfere with the integrity of the proceeding. *United States v. Stites*, 56 F.3d 1020, 1024, 1026 (9th Cir. 1995) (quoting *Wheat*, 486 U.S. at 164).

Habeas relief is not warranted here. The undisputed record of Gebreselassie's frequent attempts to change counsel, and the trial court's patience in hearing his many complaints and motions, shows that the state appellate court's ruling was reasonable.

Gebreselassie changed counsel roughly five times. His last attempt was to retain Lefcourt, an attorney who had repeatedly waffled about whether he could represent him. All this would indicate to a reasonable court that Gebreselassie was attempting to delay proceedings, rather than to ensure that he was fairly represented.

The counsel he had, Stallworth, was familiar with the case and diligent in his representation. According to the trial court, Stallworth

> more than adequately represented [Gebreselassie]. He was professional and ethical in spite of [Gebreselassie's] outrageous behavior and conduct. He possessed superior knowledge of the laws and procedures and evidence in this case. In fact, he asked many questions written out by [Gebreselassie] that were clearly not his own questions but from [Gebreselassie]. His overall representation of [Gebreselassie] was professional, ethical and beyond reproach.

(Ans., Dkt. No. 26-18 at 689.) On such a record, there is no doubt that "the essential aim of the Amendment" to guarantee an "effective advocate" for Gebreselassie was attained. There was no constitutional violation. The state appellate court's rejection of this claim was therefore reasonable and is entitled to AEDPA deference. This claim is DENIED.

## VI. Termination of Self-Representation

Gebreselassie claims the trial court violated his right to self-representation. (Pet., Dkt. No. 1. at 96.) The fault for this lies with petitioner, not the trial judge. Gebreselassie repeatedly engaged in objectionable and disruptive behavior before and during trial. The state appellate court summarized that behavior:

> [Gebreselassie] was cautioned when he was granted pro per status that he would have to act appropriately during trial or the court could terminate his right to self-representation. 'You also understand, the other part that concerns me a little bit that you, again, tend to get a little verbose and a little worked up when you get agitated. And when you're before the trial judge and he decides that you stepped over the line, he can terminate your pro per privileges right in the middle of trial and assign you a lawyer, and that very seldom looks good to the jury. They're going to go, wow, all of a sudden this guy's messed this up so bad and now he's got a lawyer. That generally works to the detriment of the case.' [Gebreselassie] acknowledged that he understood.

During jury selection, with the jurors outside the courtroom, [Gebreselassie] engaged in a prolonged and heated diatribe accusing the Meharis of murdering his brother and the prosecutor, the trial court and District Attorney Nancy O'Malley of being prejudiced against him. The outburst resulted in his removal, yelling and screaming, from the courtroom. When [Gebreselassie] was brought back the next day, the court warned him he would be removed again if there were further outbursts.

Angesom Mehari was the state's first important witness. During cross-examination, [Gebreselassie], acting as his own counsel, accused him, rather dramatically, of murdering Abraham: 'The question is you were there participating in Abraham's murder!!! You were there at Abraham's house killing my brother!!! Tell the truth!!!' The court warned him 'I don't want another outburst like that. If you do that again, you know what the consequences [are].'

Things deteriorated the next day. When the court instructed [Gebreselassie] to move to another line of questioning, [Gebreselassie] exclaimed, 'I have never seen this kind of justice.' The trial court admonished him to keep quiet, but he continued: 'I'm not going to keep quiet. That's my life. That's my life. The jurors has [sic] the right to know everything. You're arguing justice. You're prejudiced. That's my life. I have a right to defend the way I want to defend. The jury knows that he's prejudiced.' The court excused the jurors and admonished [Gebreselassie]. 'I've warned you before. You continue not to follow my instructions. You're disrespecting the Court. You're disrupting the trial. So until you can do that and keep your words to yourself, you are out of here. So he's out of here.' Before [Gebreselassie] could be removed, he responded: 'It doesn't matter. You are trying to give my case to my adversary [sic] counsel. No problem. You're a prejudiced person. We all know that. You are acting like a DA.'

Later that day [Gebreselassie]'s advisory counsel sought clarification about his role in light of [Gebreselassie]'s absence from the courtroom. The court explained it had not yet decided whether to revoke [Gebreselassie]'s pro per status and intended to review the case law. The next day, [Gebreselassie] accused the court of disliking and disrespecting him, offending his family, and trying to revoke his pro per status 'from the beginning.' The court terminated his self-representation. It explained: 'There's certainly a component of emotional instability, and that's been demonstrated with his outbursts. [¶] Now, it's not sufficient for a 1368; however, I do think there are some components there . . . [¶] . . . Number one is the nature of the misconduct as stated — or as on the record. The Court had ordered him to move on. This was yesterday, to another subject matter. He refused, continued not to follow the Court's rules, regulations . . . [¶] And then as the jurors were walking out, filing out, made several comments to the Court. For

example, 'You're prejudiced. You're a prejudicial person. We all know that. You're acting like a DA.' [¶] . . . It was also the outburst during the jury selection process which evidence[d] some emotional instability. On cross-examination of the first three witnesses, the Court has continuously and constantly ordered him to ask questions and not make self-serving gratuitous statements. [¶] And in terms of the impact of the misconduct on the trial proceedings, not only is it delaying the trial, but I am afraid that it has an effect on the jury and how the jury views him versus the evidence presented. [¶] I think it clearly subverts the Court's integrity of the trial and severely compromises the Court's ability to conduct a fair trial . . . [T]he impact on the trial is to the extent that the codefendant [has] filed a motion to sever. And in the preliminary reading it looks like it was preliminarily focused on the outbursts during jury selection and then what happened yesterday.'

The court also noted its futile admonitions to follow court rules and procedures throughout the trial, [Gebreselassie]'s apparent attempt to intimidate Angesom during cross-examination, and the lack of suitable alternative sanctions. It then terminated [Gebreselassie]'s pro per status and appointed his advisory counsel to represent him for the remainder of the trial.

(Ans., Dkt. No. 26-24 at 373-375.)

Gebreselassie's claim was rejected on appeal. "The court properly exercised its discretion here. [Gebreselassie] was argumentative, insulting and disrespectful to the court, and either unable or unwilling to control his outbursts and abide by courtroom rules and protocol despite multiple warnings that failure to do so would result in the termination of his right to represent himself." (*Id.* at 376.)

A criminal defendant has a Sixth Amendment right to self-representation. *Faretta v. California*, 422 U.S. 806, 832 (1975). This right is not absolute, however. "[A] trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* at 834 n.46 (citation omitted). "The right of self-representation is not a license to abuse the dignity of the courtroom." *Id.*

Gebreselassie's disruptive behavior gave the trial court reasonable cause to revoke his *Faretta* status. A review of the transcript reflects a pattern by him to engage in serious and obstructionist misconduct: heated rants that resulted in his removal from the courtroom; insults directed at the judge and counsel; inappropriate questioning of witnesses; refusal to abide by the court's instructions and follow court protocol, etc. The

state court's decision was reasonable and is therefore entitled to AEDPA deference. Accordingly, this claim is DENIED.

## VII. Admission of Winta's Diary Entries

Gebreselassie claims the trial court violated his right to due process by admitting diary entries from Winta's laptop. (Pet., Dkt. No. 1 at 98.) He contends they were inadmissible hearsay. I discussed the facts underlying this claim above, including the state appellate court's approval of the admission of the entries.

As determined above, the diary entries were properly admitted. Furthermore, Gebreselassie fails to show prejudice. The entries memorialized Winta's grief and love for Abraham and her distress over the Gebreselassie family's suspicions. They did not inculpate petitioner nor have any perceptible effect on his defense.

The state court's decision was reasonable and is therefore entitled to AEDPA deference. Accordingly, this claim is DENIED.

## VIII. Exclusion of Homosexuality Evidence

Gebreselassie claims the trial court wrongly excluded evidence that Winta's brothers, twins Merhawi and Angesom, were homosexual. (Pet., Dkt. No. 1 at 99.) He believed that the Meharis killed Abraham in part because he knew of and was going to publicly expose the brothers' homosexuality, a sexual orientation disapproved of by the family's church and by Ethiopian society. (Ans., Dkt. No. 26-24 at 380-382.)

Gebreselassie wanted to question the brothers about their sexuality and "alleged involvement with gay chat lines or web sites." (*Id.* at 380.) The trial court said it might allow such evidence to be admitted, but only after Gebreselassie testified to his beliefs about the brothers. (*Id.* at 381.) On cross-examination, he questioned the brothers about their sexual orientation. (*Id.*) When he later questioned Merhawi on direct examination about his homosexuality, the court sustained objections to such questions. (*Id.*)

Gebreselassie's claim was rejected on appeal:

[Gebreselassie's] central complaint seems to be that, while the jury heard a good deal about homosexuality, his defense was crippled because he was not

23

permitted to question the Mehari twins about or offer other evidence to prove "the fact of" their homosexuality. Nonsense. As chronicled above, [Gebreselassie] was permitted to introduce more than ample evidence supporting his defense theory that the Meharis tried to kill him because he threatened to go public with his accusations about Angesom and Merhawi. While the court limited his ability to introduce evidence of their actual sexual orientation or activities, its rulings were well within its broad discretion to exclude evidence on the grounds that its probative value was substantially outweighed by the risk of undue delay, prejudice or confusion.

(*Id.* at 383.)

Habeas relief is not warranted here. The state appellate court reasonably determined that the trial court's decision made little difference because Gebreselassie had been allowed to present sufficient evidence of the twins' homosexuality. How any additional evidence would have strengthened his defense or how the exclusion acted to his detriment is unclear. The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. This claim is DENIED.

## IX. Admission of Child Custody Evidence

Winta's brother, Yehferom, testified at trial that he had been awarded custody of her son, Isaac, and that the Gebreselassies had been denied visitation rights. Gebreselassie claims the admission of such evidence violated his constitutional rights. (Pet., Dkt. No. 1 at 102.)

The state appellate court rejected this claim because the evidence was innocuous and related to collateral matters. The Court agrees. Furthermore, Gebreselassie has failed to show prejudice. The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. This claim is DENIED.

## X. Prosecutor's Comment

There was an allegation that Merhawi Mehari told Asmeret Gebreselassie, petitioner's sister, in front of other witnesses, that he would kill her and drink her blood. Merhawi denied this when asked by Tewodros's counsel on cross-examination. In closing argument, the prosecutor mentioned that no witnesses testified in support of the allegation.

Gebreselassie claims the prosecutor's statement constituted misconduct. (Pet., Dkt. No. 1 at 103.)

The state appellate court concluded that the comment was a permissible comment on the state of the evidence and related to a tangential event. (Ans., Dkt. No. 26-24 at 387.) The Court agrees. In no plausible way can the prosecutor's comment be thought to have deprived Gebreselassie of a constitutionally fair trial. Furthermore, he has failed to show prejudice. The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. This claim is DENIED.

## XI. Morris's Testimony

Sergeant Morris testified that he did not believe Tewodros's version of events. Gebreselassie claims that such testimony was prejudicial to him. (Pet., Dkt. No. 1 at 108.) Habeas relief is not warranted here because Gebreselassie has not shown prejudice. His own testimony was highly inculpatory and easily outweighs any adverse effect Morris's testimony had. This claim is DENIED.

## XII. Cumulative Error

Gebreselassie claims that the cumulative effect of the errors at trial violated his right to due process. (Pet., Dkt. No. 1 at 109.)

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Habeas relief is not warranted here. Gebreselassie has not shown that there were any constitutional errors. Therefore there can be no cumulation of errors that deprived him of a fair trial. This claim is DENIED.

## CONCLUSION

Gebreselassie's ineffective assistance of counsel claims are DISMISSED as

procedurally defaulted. His remaining claims are denied for want of merit.

The state court's adjudication of Gebreselassie's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law. Further, the state court's findings did not result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Gebreselassie may seek a certificate of appealability from the Ninth Circuit.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:** October 9, 2018



WILLIAM H. ORRICK
United States District Judge